## THE CONSERVA.[1]

### UNITED STATES v. THE CONSERVA.

#### (District Court, E. D. New York. March 5, 1889.)

1. NEUTRALITY LAWS—ADMIRALTY—PROCEEDINGS FOR FORFEITURE.

The crime necessary to be shown in order to secure a forfeiture of a vessel under section 5283, Rev. St. U. S., consists of an act done within the limits of the United States, with the intent that the vessel in connection with which the act is done shall be employed in the service of some foreign prince or state, or colony, district, or people, as a cruiser or committer of hostilities

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

against the subjects, citizens, or property of some foreign prince or state, or colony, district, or people, with whom the United States are at peace    The intent described in the statute is a necessary ingredient of the offense created by the statute, in the absence of which no crime is committed or forfeiture incurred.

**2. SAME.**

In a proceeding instituted under section 5283, Rev. St. U. S., the fact must be shown that the government against which it is alleged that the vessel is intended to commit hostilities has been recognized by the United States.

**3. SAME—EVIDENCE.**

Where on the evidence the most that could be said was that a vessel was fitted out with intent to send her to the port of Samana, San Domingo, where she might, in certain contingencies, be employed to sally forth in the service of a faction in the island of Hayti under one Hyppolite, to cruise or commit hostilities against an organization controlled by one Legitime, neither of which factions had been recognized as a belligerent power by the government of the United States, *held*, that a proceeding could not be maintained to forfeit the vessel under section 5283, Rev. St.

**4. SAME.**

Where the evidence showed that a vessel was fitted out for the purpose of proceeding from New York to Samana, in a condition incapable of being used to commit hostilities against any one, to be there delivered to the government of the Dominican republic, *held*, that for the use to which she might thereafter be put by the government of the Dominican republic that government was responsible, and not the United States; and that a well-founded suspicion that the government of the Dominican republic would use the vessel to violate its neutral obligations was not sufficient to justify a finding in this case that the fitting out done in New York was done with that intent to use her to commit hostilities, which, under the statute, is the gist of the offense.

**5. SAME.**

Whether, under section 5283, Rev. St., the act to be proved in order to condemn the ship must be the act of fitting out and arming the vessel, or of aiding such an act, or attempting such an act, *quære*.

**6. SAME—DECREE.**

A proceeding under section 5283, Rev. St., is a simple suit in admiralty, where the decree will be simply that the libel be dismissed, or the vessel condemned; and no decree of restitution is necessary.

**7. SAME—FOREIGN CLAIMANT—RIGHT TO INTERFERE.**

A consul of a foreign government, who is the only representative present of his government, has the right to intervene and claim a vessel belonging to such government, against which a libel has been filed to secure her forfeiture.

In Admiralty.

Action against the steam-ship Conserva brought under section 5283, Rev. St. U. S., to secure a forfeiture of the vessel for an alleged violation of the neutrality laws.

*Mark D. Wilber*, U. S. Dist. Atty., and *John L. Devenney*, Asst. Dist. Atty.

*Macfarland, Boardman & Platt* and *David Wilcox*, for the Conserva.

BENEDICT, J. This is a proceeding in admiralty, instituted by the district attorney against a vessel known as the steam-ship "Conserva," to secure the forfeiture of that vessel for a violation of the neutrality laws of the United States. The proceeding is taken under section 5283 of the Revised Statutes, which provides as follows:

"Every person who, within the limits of the United States, fits out and arms, or attempts to fit out and arm, or procures to be fitted out and armed,

or knowingly is concerned in the furnishing, fitting out, or arming, of any vessel, with intent that such vessel shall be employed in the service of any foreign prince or state, or of any colony, district, or people, to cruise or commit hostilities against the subjects, citizens, or property of any foreign prince or state, or of any colony, district, or people, with whom the United States are at peace, * * * shall be deemed guilty of a high misdemeanor. * * * And every such vessel, her tackle, apparel, and furniture, together with all materials, arms, ammunitions, and stores which may have been procured for the building and equipment thereof, shall be forfeited."

The libel, in the second article, avers that certain persons to the district attorney unknown, within the limits of the United States and of the Eastern district of New York, and within the jurisdiction of this court, fitted out and armed this vessel, with the intent that she should be employed in the service of a certain people and district of the island of Hayti, (to-wit, certain rebels, who are in a state of insurrection against the organized and recognized government of the republic of Hayti,) to cruise or commit hostilities against the subjects, citizens, and property of the republic of Hayti, with which the United States of America then was, and now is, at peace. The third article contains an averment that certain persons to the attorney of the United States unknown, within the limits of the United States and the Eastern district of New York, were knowingly concerned in the furnishing and fitting out of said vessel, with the intent that said vessel should be employed as stated in the first article. The fourth article avers that within the limits the United States, at the Eastern district of New York, certain persons to the attorney of the United States unknown, fitted out, furnished, or armed the said vessel; which persons had knowledge that said vessel should be employed in the service of a foreign people, (to-wit, a portion of the people of the island of Hayti,) to cruise or commit hostilities against the subjects, citizens, or property of the republic of Hayti, with which the United States of America then was, and now is, at peace. The fifth article charges that certain persons to the said attorney of the United States unknown, within the limits of the United States and of the Eastern district of New York, and within the jurisdiction of this court, attempted to fit out and arm the said vessel, with intent that such vessel should be employed in the service of a foreign people, (to-wit, a portion of the people of the island of Hayti,) to cruise or commit hostilities against the subjects, citizens, or property of the republic of Hayti, with whom the United States of America then was, and now is, at peace. Upon the filing of the libel, process *in rem* was issued, and the vessel taken into custody by the marshal. Thereupon a claim was interposed by Leoncio Julia, consul of the Dominican republic, intervening as such consul for the interest of the government of the Dominican republic, in which claim it is averred that Leoncio Julia was in possession of the said vessel at the time of the attachment thereof, and the government of the Dominican republic is the true and *bona fide* owner of said steam-ship, and no other person is the owner thereof. No exceptions were taken to any of the articles of the libel, but on the same day an answer to the libel was filed, and application made on the part of the claimants for an immediate trial. After

hearing the district attorney in opposition, the 22d inst. was fixed for the trial. On that day the hearing was commenced, and at the close of the day continued to Monday, the 25th. On the opening of the court on the 25th the district attorney made application for leave to file an exception to the claim, and also an exception to the answer. Objection being made, liberty was given to file the exception to the claim, with a direction that the hearing upon such exception be had at the same time with the hearing upon the merits. Permission to file exceptions to the answer was denied upon the ground that the trial was already in progress, and that at the time when the day for trial was set the intention to except to the answer was abandoned. The hearing thereupon proceeded, and continued until the 28th inst., on which day the case was submitted to the court for its decision.

In disposing of the case it will be convenient at first to consider the point taken by the district attorney, that, the claim having been excepted to, the libel must be sustained because of insufficient proof of such an interest in the ship as entitled the consul of the Dominican republic to intervene in behalf of the Dominican government. Here there seems to be some misapprehension. This is not a case of property seized by the collector, nor of the property captured as prize, or taken by any kind of executive seizure, but a simple case in admiralty, where the decree will be either a decree dismissing the libel, or condemning the vessel. In such cases I do not understand that any decree of restitution is necessary. If the decree be adverse to the libelant, the decree is simply that the libel be dismissed, and the vessel discharged from the custody of the marshal. In such a case the intervention of a consul in behalf of his government, intervening for its interest in the vessel, seems to me entirely proper. The more so in this case because it appears that the government of the Dominican republic has no representative here except the consul who has intervened. In numerous instances the intervention of a consul in the interest of citizens of his own country has been permitted. No reason is seen for refusing such permission when the intervention is in behalf of his own government. *London Packet*, 1 Mason, 14; *The Adolph*, 1 Curt. 87; *The Bello Corrunes*, 6 Wheat. 166. Such action on the part of the consul has nothing to do with negotiations with foreign states, nor is it an attempt to vindicate any prerogative of government. He simply represents his government as having an interest in the vessel proceeded against. Such interest is shown in this instance by a bill of sale, whereby the legal title of the vessel proceeded against has been passed to the government of the Dominican republic. This is proof, in my opinion, sufficient to permit the intervention of the consul for the purpose of contesting the question of forfeiture that has been raised by the libel. In the case of *The Meteor*, Judge BETTS declined to entertain a similar objection to the claim, upon the ground that the issue was immaterial in cases of this description, and the point was not pressed on the appeal.

Passing now to the merits, the following facts may be stated as established by the evidence: The steamer in question was bought by the

mercantile firm of Kunhardt & Co. to fill an order placed with them by one Nemur Auguste for a steamer adapted to be converted into a gun-boat, to be delivered in Samana, a port of the Dominican republic, to the government of the Dominican republic, a nation at peace with the United States, and, so far as appears, not involved in any war. Thereupon Kunhardt & Co. caused the steamer—at that time named the Madrid—to be fitted out at the port of New York by piercing her with port-holes for guns, plating her sides with iron, and otherwise rendering the vessel suitable to be converted into a gun-boat. Her capacity to commit hostilities was dependent upon her being supplied with guns. Without guns she was incapable of being used for any hostile cruise. Bills of sale were executed and delivered from the former owner to one C. P. Kunhardt, an agent of Kunhardt & Co., and from him to Kunhardt & Co., and thereafter a bill of sale from Kunhardt & Co. to the government of the Dominican republic was executed and delivered to the consul of the Dominican republic. The nationality of the vessel was then changed from American to that of the Dominican republic, and her name altered from "Madrid" to "Conserva;" and, having been openly cleared by the collector at the custom-house for the port of Samana, she set sail from the port of New York on the 16th day of February, 1889, on the voyage aforesaid, in charge of a master, provided with an ordinary crew, suitable only for the navigation of the ship during such a voyage, and having on board an agent of Kunhardt & Co., charged with the duty of receiving from the Dominican republic at Samana the balance of the money due Kunhardt & Co., on the delivery of the vessel to that government in Samana. As before stated, she had no armament whatever, nor any munitions of war, and was incapable of being used to commit hostilities of any kind until supplied with guns. After the vessel had proceeded a short distance on the voyage aforesaid, she sprung a leak, and thereupon she returned to the port whence she had sailed, where she was then attached by the marshal by virtue of the process issued in this cause. These facts are considered established by the proofs. The case contains other testimony as to other facts, not now alluded to, because, in my opinion, the facts already stated compel a dismissal of the libel, and that for the following reasons: This is a statutory proceeding taken under the provisions of the statute above quoted. By that statute certain acts in connection with a vessel, when done within the United States, and with a certain intent, are made crimes. And it is provided "that every such vessel, her tackle, apparel, and furniture, together with all materials, arms, ammunitions, and stores which may have been procured for the building and equipment thereof, shall be forfeited." The language of this section, which is reproduced from the act of 1818, has on more than one occasion given rise to the question whether the words "such vessel," as used in the statute, must not be understood to mean a vessel fitted out and armed. In the case of *The Meteor* such a construction of the statute was rejected by Judge BETTS. The decree of Judge BETTS was reversed by Mr. Justice NELSON on other grounds, but it is to be observed that the learned justice is careful to state that upon this question he expresses no opinion. In

*U. S.* v. *Quincy*, 6 Pet. 465, it was said by the supreme court of the United States:

"With respect to those who have been denominated at the bar the chief actors, the law would seem to make it necessary that they should be charged with fitting out 'and' arming. These words may require that both should concur, and the vessel be put in a condition to commit hostilities, in order to bring her within the law."

This intimation seems calculated to raise doubt upon this question, if not to raise inquiry as to the correctness of the ruling which gave occasion for the intimation, and renders it possible still to contend that under this statute—a statute which, it must be remembered, marks out for the courts the limit of the neutral obligations of the United States—the act to be proved in order to condemn the ship must be the act of fitting out and arming the vessel, or of aiding in such an act, or attempting such an act. See argument of Mr. Evarts, in the *Meteor Case*, Volume 2, p. 44. Thus much may be said upon this question in the hope that by chance attention in some proper quarter may be again called to the language of this statute, and its limited scope. My decision will be placed on other grounds now to be stated.

As has been often said, the intent described in this statute is a necessary ingredient of the offenses created, in the absence of which no crime is committed, nor any forfeiture incurred. The crime necessary to be shown in order to forfeit the ship consists of an act done within the limits of the United States, when done with that intent, namely, the intent that the vessel in connection with which the act is done shall be employed in the service of some foreign prince or state, or colony, district, or people, as a cruiser or committer of hostilities against the subjects, citizens, or property of some foreign prince or state, or colony, district, or people, with whom the United States are at peace. The libel in this case charges certain acts to have been done in connection with the vessel, with the intent that the vessel be employed in the service of certain rebels in a state of insurrection against the organized and recognized government of the republic of Hayti, to cruise and commit hostilities against the subjects, citizens, or property of the republic of Hayti, with whom the United States are at peace. A violation of the neutrality which the United States is bound to maintain between the rebels mentioned and the government of the republic of Hayti is the *gravamen* of the charge. But the evidence fails to show a state of facts from which the court can conclude that the United States was ever under any obligations of neutrality to the rebels mentioned, or is now under any obligations of neutrality to the government of the republic of Hayti; that government, as it appears, having been overthrown, and neither of the factions striving to establish a government there having been recognized as lawful belligerents by our government. Upon the evidence the most that can be said is that the vessel was fitted out with intent to send her to Samana, where she might, in certain contingencies, be employed to sally forth in the service of Hyppolite, referred to in the libel as a rebel against the organized and recognized government of the republic of Hayti, to cruise

and commit hostilities against an organization, in the island of Hayti controlled by Gen. Legitime; which organization, it is contended by the district attorney, constitutes the government of the republic of Hayti. But the evidence fails to show that either of the factions contending with each other for the government in Hayti have been recognized by the government of the United States as a belligerent power capable of making peace or of carrying on lawful war. It is true that various documents issued from the department of state have been put in evidence, containing certain expressions which the court is invited to examine in order to find therein an implied recognition of the faction of Legitime as representing the government of Hayti. I do not think that in a case like this the court is required to deal with uncertain implications contained in such documents as have been here presented. The fact of public recognition of any prince, state, colony, district, or people as a belligerent, is one to be made known to all men by public proclamation from the executive, or some public act by necessary implication equivalent to such a proclamation. It was easy for the government in this case to furnish a certificate as to its position in regard to the contending forces in Hayti. If, in the understanding of the government, either of these factions had been recognized by the government as a lawful belligerent, no reason is suggested why such fact would not have been stated by certificate. Such a certificate was produced in the *Case of the Meteor*. Under the circumstances, the absence of such a certificate proves the absence of the fact. Furthermore, the message of the president of the United States, put in evidence by the claimant, proclaims as follows:

"I announce with sincere regret that Hayti has again become the theater of insurrection, disorder, and bloodshed. The titular government of President Salomon has been forcibly overthrown, and he driven out of the country to France, where he has since died. The tenure of power has been so unstable amid the war of factions that has ensued since the expulsion of President Salomon that no government constituted by the will of the Haytian people has been recognized as administering responsibly the affairs of that country."

This message, certainly, in the absence of any proclamation or certificate to the contrary, is conclusive to show the absence of such recognition. The law applicable here has been declared in numerous authorities, which may be found cited in the case of *The Ambrose Light*, 25 Fed. Rep. 408; to which I add an extract from the letter of Mr. Attorney General Hoar to the secretary of state, dated September 16, 1869, in which he says, (13 Ops. Atty. Gen. 178:)

"If ever the time shall come when it shall seem fitting to the political department of the government of the United States to recognize Cuba as an independent government, entitled to admission into the family of nations, or, without recognizing its independence, to find that an organized government capable of carrying on war, and to be held responsible to other nations for the manner in which it carries it on, exists in that island, it will be the duty of that department to declare and act upon those facts. But, before such a state of things is found to exist, it is not, in my judgment, competent for a court to undertake to settle those questions. The judicial tribunals must follow and conform to the political action of the government in regard to the existence of foreign states, and our relations to them; and it would, in my opinion, be

inconsistent with the honor and dignity of the United States to submit to a court, and allow to be declared and acted upon, in such an indirect manner, rights and duties towards a foreign nation which the government is not prepared distinctly and upon its own responsibility to avow and maintain."

Such being the law, it seems plain that this prosecution must fall for want of proof that either Hyppolite or Legitime have been recognized by our government as belligerent powers. In the absence of proof of that fact, the fitting out of a vessel with intent to enter the service of one to commit hostilities against the other is not brought within the scope of the statute.

There is another defect in the evidence, and that is a failure to prove an intent to fit out this vessel for hostilities against Legitime or any one else. The evidence establishes the fact that this vessel was fitted out with intent to send her to the port of Samana in charge of an ordinary crew, and in a condition which rendered her incapable of being used to commit hostilities against any one; and that is all. There is no evidence of an intent to use the port of New York as a sally-port—a naval base—for a hostile expedition against any one. The vessel was dispatched from New York to the port of Samana. All that was done within the limits of the United States in connection with this vessel was done with the sole intent of dispatching her upon that peaceful voyage. It is no case of simulated destination. Samana, as all agree, was the real and only destination of the vessel in the contemplation of those fitting her out, when she was thus fitted out, and when she sailed. Those who fitted her out come forward in court, and declare upon the witness stand that they fitted her out with that and no other intent. The case contains no evidence sufficient to warrant a rejection of their testimony. Neither is it a case of touching at a port of call in the course of a continuous voyage to some other port. Her master was engaged by Kunhardt & Co. to take her to Samana, and there leave her. Her crew shipped for a voyage to Samana, and no further, and their passage home from Samana was provided for by Kunhardt & Co. Whatever was done within the limits of the United States in fitting out or dispatching the vessel must, upon the evidence, be found to have been done with this intent and no other, namely, that the vessel should go direct from New York to Samana; that there her voyage was to end, the crew to be dismissed, and the vessel then passed from the hands of those who fitted her out into the hands of the government of the Dominican republic. When so delivered she would be capable indeed of being employed thereafter by the government of the Dominican republic as it might deem fit, but there was no intent whatever on the part of those who fitted her out in New York that she was to be employed thereafter in any capacity whatever. That such was in truth and in fact the voyage for which she was fitted out, and on which she sailed, is placed beyond dispute by the testimony in the case of *The Carondelet*, 37 Fed. Rep. 799, (a case lately tried before Judge BROWN in the Southern district of New York,) which testimony has been read in this case by consent, from which it appears that guns apparently intended to be used to arm

this vessel, and belonging to the government of the Dominican republic, were to be transported in the steam-ship Carondelet to Samana. So it is found proved in that case, as in this, that the vessel was fitted out in New York with intent to send her to Samana direct, for the sole and only purpose of there handing her over, in the condition in which she sailed, to the government of the Dominican republic.

A suggestion was made on the argument that Kunhardt & Co. must have understood that after the delivery of the vessel in Samana she was to be there converted into a gun-boat, and in case she should sail from that port it would be in the service of Hyppolite, to cruise against the forces of Legitime. And it seems that some sailors shipped in New York believed that such would eventually be the employment of the vessel. The chief engineer, who shipped in New York for a voyage from New York to Samana, evidently was solicitous that the men shipped in his department should be willing to remain on board the vessel in some future employment of her after the termination of the voyage to Samana. But no engagement of any one was made for employment in the service of Hyppolite; and, making the most of the testimony, it is barely sufficient to indicate that those fitting out the vessel in New York had ground to suspect that the government of the Dominican republic would be likely to permit the vessel, when converted into a gun-boat at Samana, to issue thence in the service of Hyppolite. Such a suspicion, if entertained by Kunhardt & Co. while fitting out the vessel, by no means justifies the finding as a fact that part of their project was to furnish a gun-boat for Hyppolite, or to hold any of their acts to have been done with intent that the vessel should be used to commit hostilities against Legitime. It is obvious that a subsequent departure of this vessel from Samana upon a hostile expedition against the forces of Legitime was necessarily contingent upon arrangements to be made by the government of the Dominican republic, and could form no part of the present intent with which the vessel was fitted out in New York. The case is within the decision of the supreme court of the United States in *U. S.* v. *Quincy*, 6 Pet. 445. The case of a vessel fitted out in New York to issue thence for the purpose of being armed at sea, and then proceeding upon a hostile cruise, is not before the court. The case in hand is simply the adventure of fitting out within the limits of the United States, and sending thence to the port of Samana, for the sole purpose of a delivery there to the government of the Dominican republic, a vessel capable of being converted there into a gun-boat. Such an adventure is, in my opinion, a commercial adventure not prohibited by the statutes of the United States. It is, of course, true that the fitters out of this vessel acted with knowledge that she was capable of being converted into a gun-boat in Samana. No doubt they understood that she would be so converted upon her arrival there. But there is no proof that they knew, nor is it seen how they could know, to what service she would be put by the Dominican republic after her conversion into a gun-boat at Samana. The case is barren of evidence as to the intentions of the government of the Dominican republic regarding the vessel, beyond the fact of an intention to

make a gun-boat of her. It is possible that, when converted into ᵃ gun-boat at Samana, this vessel may be dispatched thence upon some hostile cruise. But for acts done in the port of Samana in connection with this vessel the government of that country, not the government of the United States, is responsible. I am not aware that the government of the United States has undertaken to guaranty the discharge by the Dominican republic of its obligations of neutrality as regards the contending factions of Hayti, and feel confident that the statute under consideration contains no provisions that can be resorted to for the protection of any prince, state, colony, district, or people against any such apprehended violation of its neutral obligations by the government of the Dominican republic. It seems certain that a suspicion entertained by those who fitted out this vessel in New York that the government of the Dominican republic upon receipt of the vessel in Samana would conclude to violate its neutral obligations is not sufficient to justify a finding that the acts done by such persons in New York in fitting out the vessel were done with that intent, which, under the statute, is the gist of the offense. For these reasons the libel must be dismissed.[1]

---

[1] An appeal was taken by the United States from the above decision, which appeal was afterwards ordered discontinued by the attorney general of the United States, on the first ground taken by the above decision, *i. e.,* that as the United States had recognized neither of the Haytian factions as belligerents, this action could not be maintained; and the Conserva was thereupon released from custody, and sailed on March 19, 1889, for Samana. [REP.